CHASE <i>et al.</i> <i>v.</i> BELDING.

(<i>Supreme Court, General Term, Third Department.</i> May, 1888.)

COLLISION—UNUSUAL LIGHTS—CONFLICTING EVIDENCE—APPEAL.

    In an action for damages caused by a collision of vessels, where the evidence shows that defendant's vessel displayed unusual lights, which misled the pilot on plaintiffs' boat, and the testimony on either side regarding the occurrences immediately before the collision is in direct conflict upon material matters, the verdict of the jury, whose determination rested upon a consideration of the conduct of the vessels at and before the collision, will not be disturbed.

Appeal from circuit court.

Action by Emory A. Chase and William J. Hughes, executors of William Donohue, deceased, against William Belding. Judgment for plaintiffs, and defendant appeals.

Argued before LEARNED, P. J., and INGALLS and LANDON, JJ.

*E. P. Wheeler,* for appellant. *Peter Cantine,* for respondents.

INGALLS, J. A reversal of the judgment is asked by the appellant upon the ground that the parties who were in charge of the Vanderbilt at the time of the collision were guilty of negligence which contributed to the injury of which the plaintiffs complain. Notwithstanding the able argument of the defendant's counsel in support of the case of the appellant, we are convinced by the facts that a fair question of fact was presented for the determination of the jury upon that subject, and that the defendant has failed to show a preponderance of evidence in his favor which calls for a reversal of the judgment upon that ground. *Cheney* v. *Railroad Co.,* 16 Hun, 415. The evidence bearing upon that question was conflicting, and its determination by the jury involved an investigation in regard to the conduct of the parties who were in charge of the vessels respectively, not only at the precise period when the collision occurred, but also as the vessels approached each other. The casualty was upon a dark night. The Yosemite was proceeding northward at the rate of 16 miles an hour, and the Vanderbilt southward at the speed of 9 miles an hour. The Yosemite displayed signal lights which were unusual, and not authorized, in navigating the Hudson river, in the night-time; and thereby violated the laws of navigation. It was claimed upon the trial, and now here insisted upon, by the plaintiffs, that the display of such lights by the defendant had the effect to mislead and bewilder the parties in charge of the Vanderbilt to such a degree that they were unable to determine, until the vessels had approached each other within dangerous proximity, from what source the lights proceeded, whether from a vessel or tow, in motion upon the river, or from a dwelling upon the land. Jeremiah Whitaker, a witness produced by the plaintiffs, and

who was the pilot upon the Vanderbilt wherè the collision occurred, and whose evidence is greatly relied upon by the plaintiffs, testified as follows:

"The first light that I observed in going down the river after we passed Rhinebeck was a red light on a sail vessel beating up. After that I observed a light which proved to be on the yacht Yosemite. I first observed it when I was down between the two ice-houses. I saw three bright lights,—white ones. I thought they were on a tow,—two low lights and one high one. I supposed the two lights were on the canal-boat on a tow. *Question.* Where did they appear to be, those two white lights? *Answer.* I took them to be on a tow-hawser tier of a tow going down south. I took the high light to be a steam-boat's after-stern light. A steam-boat towing other vessels has her stern lights arranged one right under the other; the flagstaff on the rear end of the boat. They show all around. They are usually placed from a foot and a half to two feet apart. I could not tell exactly how far off these three lights were. They were pretty well down to the Esopus light. I could not tell whether they were above or right opposite the light, because they were to the eastward. *Q.* How far did those lights appear to be away from you at that time? *A.* Probably they looked to be a mile. Two vertical lights on the stern-white lights, one above the other—appear at that distance like one light. From my observation I took that high light that I saw to be the two lights of a tow-boat blended in one. When the lights got out of range I looked through opera glasses. At night you can see better with such glasses than you can with the natural eyes. *Q.* When the lights got out of range what was your judgment of what these lights were on? *A.* I took them, one to be ashore, the other on the yacht that lay off there to anchor. *Q.* You mean by those two lights you took it to be the two low lights? *A.* Yes, sir. *Q.* What did it appear to you then that this high light was? *A.* I could not tell what it was. When they got out of range I took the night glasses. I looked at the light and all around to see if I could see anything. I could see nothing. I did not see any colored lights, either red or green, in the vicinity of this high light. This high light appeared to be to the westward of us. I could tell from the pilot-house she was off on the starboard. She was starboard of our flagstaff. That light did not appear to me at any time from the time I first observed it to be east of us. *Q.* To go down around the Esopus light, if what you had first taken—if the lights had been what you first took them to be,— a tow going down the river,—what would have been the best course to take to have passed the tow? *A.* To the eastward of them. When I made up my mind that it was the tow I saw, I headed my boat more to the eastward. From that point I always kept my course to the eastward. It was a dark night, heavy clouds, and the wind was blowing very hard from the north-east. We did not have any rain on the way down. *Q.* On such a night as that was, if there had been a green light on the starboard side of what proved to be the yacht, after you took your glasses up and looked to where you saw this high light was, if it had been a good, bright green light, would you have been able to have seen it? *A.* Yes, sir. *Q.* I will assume a state of facts. If the yacht had been headed up the river, and on a course which would have taken her west of your steam-boat, would you have been able to have seen a green light if she had had one on board? *A.* Yes, sir. *Q.* Now, assuming that she was headed up the river, and on a course which was west of the line of your steam-boat, if she had had a good, bright green light, ought not it to have been plainly visible to the naked eye the distance you were apart? *A.* Yes, sir. I did not at any time before collision see a green light upon the yacht. Before the collision I saw a dim red light on the yacht. I heard one whistle from what proved to be this yacht. I answered them with one. I afterwards gave them two. It was not over three or four seconds between the time I answered his first whistle and the time I gave the two whistles. After I gave the two whistles I heard two whistles from the yacht; they were given

just as quick as they could be given. There were no other whistles given than I have named, from either my boat or the yacht. First the yacht blew one, and I blew one right after; then I blew two, and the yacht blew two. I can't say for certain whether it was just before he blew the two whistles or right after he blew his two whistles that I saw the red light. It was one or the other. *Court.* What is the significance of one whistle? *A.* To go to the right. *Court.* For each to go to the right? *A.* Yes, sir. *Q.* What was the significance of two whistles? *A.* Each to go to the left. *Q.* You say you saw this dim red light. You can't say with certainty whether it was just before or just after. Could you indicate by anything to indicate the time? *A.* No, sir; I could not. When I first got a glimpse of that red light I did not see any other lights anywhere along-side that boat,—only the white high light. I did not see the 'bull's-eye' lights. I saw them just before she struck us. After the yacht blowed his first whistle I answered him right away with one, and then after that there was nothing done. I did not alter the wheel or anything of the kind. I gave him two whistles,—the boat was right on our course,—and he answered me with two. I hove my wheel hard a-starboard, and sheered my boat hard a-port. I kept the boat· going to the port,—kept her wheel hard a-starboard,—until I saw there was going to be a collision. I then rung four bells,—to slow, stop, and back. I had a bell-pull gong down in the engine-room. I worked pretty quick; there was no time to be lost there. Immediately after I gave him the four bells, the engineer stopped and reversed the engine. The wheel had made from three to four turns backward from the time I gave the bells until the collision took place. I think six or seven turns would have stopped it. I don't think it would have stopped her, but it would have stopped her headway. The three or four turns had materially stopped the headway of my boat. After the yacht had given the two whistles, it looked to me as if her pilot hove his wheel the wrong way and went to the eastward,—the same way I did. After the two whistles were given, the yacht headed to the eastward. After I hove my wheel over, the yacht came to the eastward faster than before,—followed us right up. The bull's-eye lights showed to me from the yacht after she appeared to be sheering more to the eastward. The yacht struck us right on our starboard bow. She went right through us; came out on the port side. I think the point where she struck us was nearer to the bow than when she came through. Up to that time I could not say that the yacht had slackened her speed. She appeared to be running very fast. I think she was making from 15 to 16 miles an hour with the flood-tide,—probably more. I could not tell exactly. I know she was running very fast. My boat went down after she ran through and cut the end off. The bow of the boat was cut entirely loose, so it floated off. She went down head first,—what was left of her. When I heard the first whistle, the yacht appeared to be about 500 yards distant; might have been less. From the time the yacht gave the two whistles I don't think we made three times our length before she struck us. *Court.* About how far do you think? *A.* I could not tell, hardly. *Q.* You are satisfied that your boat had not run three times her length? *A.* Yes, sir. My boat was a little over 200 feet long. She struck us while we were backing. *Q.* Your engineer did not stop backing at all until you hailed him? *A.* No, sir. When the four bells were rung I could not tell how far apart we were. I knew they were not a great ways apart; how far I could not get; it may have been 200 or 100 feet. I can't tell anything about it. *Q.* When was. it that you first observed that the yacht appeared to be heading to the east of you, so that she had run across your bow? *A.* I could not tell that; I could not answer that, hardly. *Q.* In reference to the time that you heard these whistles,—the two whistles,—was it before or after the two whistles were given that she appeared to be headed across your bow? *A.* After I gave her the two whistles. *The Court.* When the one whistle was given, how did she appear headed? *A.* I could not get

much range only by the high light; I could not tell.  *Q.* But when you saw that high light, when the one whistle was given, over which bow did you see the high light?  *A.* Over the starboard bow.  *Court.* That is westerly of the channel?  *A.* Yes, sir.  *Q.* What reason did you have for changing from one whistle to two whistles?  *A.* Because it was not safe for me to go across her bow to the westward of her.  *Court.* Where was she when you gave the one whistle?  *A.* She was to the westward of me.  *Q.* Then you gave her two whistles because it was not safe to go to the west?  *A.* Yes, sir.  At the time the one whistle was given I could not have thrown my boat to the westward and passed her without collision on the west side.  That was the reason I gave the two so quick.  When I gave the two whistles, and he had answered them with two whistles, if he had ported his helm he would have cleared us. He could have passed with safety on the west side without a collision.  *Q.* In running down the river that night from Rhinebeck to the time of the collision, did you run or keep in about the same part of the channel of the river that steam-boats usually run in going down the river?  *A.* Yes, sir.  *Q.* In coming up the river after you round the point,—after you round Esopus light, —on what land or point do you head?  [Showing Exhibit A.]  Look at this map and tell us.  Here is a steam-boat coming up; they come around Esopus light?  *A.* Yes, sir.  *Q.* In running up the river, where do they head first? *A.* I know where I head for.  I head to the west of the Kingston light. That brings me off outside Port Ewen dock, west of the Swaney plat.  After I get past that I head over towards Rhinebeck, going right on up the center of the channel.  In running up the river, turning Esopus light, no steam-boat can run on one course so as to get past Rhinebeck and steer clear of the Swaney plat."

This witness was cross-examined by the counsel for the defendant, not only in regard to his testimony upon that trial, but also in regard to his evidence upon a previous trial, with the view, obviously, to show that his statements had been inconsistent and contradictory.  The jury witnessed the entire proceedings, and we must assume that they attached to the evidence of this witness the weight to which it was justly entitled, when compared with the other evidence in the case.  The witness was further examined and stated: "My recollection is now clear that it was about the time of the two whistles being given, and not before the first whistle, that I saw the red light."  The plaintiffs supported their case, upon the trial, by other witnesses who were present when the casualty occurred, and their evidence mainly coincided with that of Whitaker.  The plaintiffs' theory, and the evidence by which it was sought to be sustained, were assailed by the defendant upon the trial, and evidence was produced by the defendant which created a sharp conflict in regard to the main features of the case, and particularly with reference to the question of contributory negligence.  It appears by the plaintiffs' showing that when the pilot of the Vanderbilt first discovered the light which was subsequently ascertained to proceed from the Yosemite the two vessels were not less than a mile apart, and approaching each other at the combined speed of at least 25 miles to the hour.  It appears that the pilot, Whitaker, immediately commenced to investigate the lights, with the view to ascertain from what they proceeded, and, according to his evidence, it appears that the lights displayed by the Yosemite were unknown to him, and changed so rapidly in their appearance, as the vessels neared each other, as to baffle his inquiry until they had approached within dangerous proximity, when he discovered the defendant's vessel.  When the vessels were about 500 yards apart, one whistle was blown from the Yosemite, which indicated an election by those in charge of that vessel to pass to the right of the Vanderbilt, which was answered by one whistle from the last-named vessel, which indicated an assent.  Immediately thereafter two whistles were given from the Vanderbilt, which indicated that those in charge of that vessel desired to pass to the left of the Yosemite, and

these were replied to from the Yosemite by two whistles, which manifested their assent. It is quite apparent that, at this juncture, little opportunity was afforded the parties in charge of the respective vessels to calculate, to plan, or execute with any degree of deliberation. The collision occurred a few moments after the two whistles were given from the Yosemite. The witnesses on the part of the plaintiffs gave their version of the transaction, and explained their conduct in the management of the Vanderbilt. The witnesses in support of the defendant's theory testified to a state of facts which were in direct conflict with the testimony of the plaintiffs' witnesses upon matters which were material. A careful consideration of the facts has led us to the conclusion that the case was one proper for the consideration of the jury, and that their determination should not be disturbed. The counsel for the defendant practically ignores the consideration pressed by plaintiffs' counsel that the display of the erroneous signal lights by those in charge of the Yosemite had the effect to bewilder and mislead those in charge of the Vanderbilt, and thereby influenced their conduct in the management of that vessel. We deem that is a pertinent and important element, as bearing upon the question of contributory negligence. The defendant committed a grave error, at least, in navigating his vessel in the night-time upon the Hudson river with such lights; and, under the peculiar circumstances of this case, it became, we think, an important inquiry by the jury as to how far that error of the defendant may have reasonably influenced the conduct of those in charge of the Vanderbilt in the management of that vessel, as bearing upon the question of contributory negligence. In actions of this nature that question is regarded by the court as one peculiarly within the province of the jury to determine in the light of all the facts and circumstances of the particular case, and their decision will not be disturbed unless the most satisfactory reason therefor is established by the party complaining thereof. *Pomfrey* v. *Village of Saratoga Springs*, 104 N. Y. 459, 11 N. E. Rep. 43; *Cahill* v. *Hilton*, 106 N. Y. 512, 13 N. E. Rep. 339; *Probst* v. *Delamater*, 100 N. Y. 267, 271, 3 N. E. Rep. 184; *Shook* v. *City of Cohoes*, 15 N. E. Rep. 531; *Patten* v. *Pancoast*, 15 N. E. Rep. 893, (decided by the court of appeals.)

The judgment must be affirmed, with costs.